**In re RECOMBINANT DNA TECHNOLOGY PATENT AND CONTRACT LITIGATION.**

**MDL Docket No. 912.
IP–90–1679–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Nov. 18, 1994.

Jean–Paul Lavalleye, John H. Weber, Oblon, Spivak, McClelland, Maier & Neustadt, Arlington, VA.

Gerald P. Dodson, Emily A. Evans, Howard, Rice, Nemerovski, Canady, Robertson & Falk, San Francisco, CA.

John Kidd, Nicholas Coch, Rogers & Wells, New York City.

Hugh E. Reynolds, Jr., David T. Kasper, Locke, Reynolds, Boyd & Weisell, Indianapolis, IN.

Donald R. Dunner, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, DC.

John W. Houghton, Jerry W. Hyland, Barnes & Thornburg, Indianapolis, IN.

Thomas D. Nevins, Broad, Schulz, Larson & Wineberg, San Francisco, CA.

Susan B. Tabler, Ice Miller Donadio & Ryan, Indianapolis, IN.

DILLIN, District Judge.

*Entry Granting in Part and Denying in Part Genentech's Motion for Leave to Further Amend Its Amended Complaint; Granting in Part and Denying in Part UC's Motion to Dismiss Counts II–VIII of Genentech's Amended Complaint; and Reinstating Genentech's § 1 Sherman Act Claim Against Lilly*

This cause comes before the Court on Genentech's motion for leave further to amend

its Amended Complaint and on UC's motion to dismiss counts II–VIII of Genentech's Amended Complaint. For the following reasons, Genentech's motion is GRANTED in part and DENIED in part, and UC's motion is GRANTED in part and DENIED in part. Furthermore, we reinstate Genentech's § 1 antitrust claim against Lilly.

### Background

This action is one of the six cases consolidated in this Court for pretrial proceedings by the Judicial Panel on Multidistrict Litigation. *See In re Recombinant DNA Technology Patent and Contract Litig.,* Docket No. 912 (J.P.M.L. Feb. 19, 1992), *aff'd, In re Regents of the Univ. of Cal.,* 964 F.2d 1128 (Fed.Cir.1992); *In re Recombinant DNA Technology Patent and Contract Litig.,* Docket No. 912 (J.P.M.L. Oct. 1, 1993). The consolidated cases arise out of various research arrangements and license agreements among the Regents of the University of California (UC), Genentech, Inc. (Genentech), and Eli Lilly & Company (Lilly).

At the foundation of this dispute is one of UC's patents, United States Patent Number 4,363,877 (the '877 patent). The research that resulted in the issuance of this patent occurred in the late 1970s, when certain of UC's scientists attempted to produce human growth hormone (hGH) by means of recombinant DNA technology. UC applied for the '877 patent on April 12, 1978. This patent claims an intermediate product used in the recombinant DNA production of hGH.[1]

On September 12, 1978, Lilly and UC executed an option agreement (1978 option agreement). This agreement gave Lilly the exclusive right to acquire from UC a license of certain patents that eventually might issue from UC's research relating to hGH—research that the United States Department of Health, Education and Welfare (the HEW) had funded.[2] In exchange, Lilly agreed to underwrite costs of obtaining patent protection.

The 1978 option agreement contained several conditions. The agreement was contingent upon the HEW granting UC the right to execute such a license and was subject to any additional limitations imposed by the HEW. The option agreement also provided that if Lilly did obtain a license, Lilly would sublicense all qualified applicants.

As Lilly and UC anticipated, the HEW required that UC enter into an Institutional Patent Agreement (IPA) as a condition for the HEW's funding of the research leading to the '877 patent. The IPA obligated UC to license any patents arising from the work funded by the HEW on a nonexclusive basis and subject only to a reasonable royalty. The IPA was executed on April 1, 1980. That same year UC applied for, but was denied, a waiver of the nonexclusive provision in the IPA.

In 1980, Genentech and UC entered into a settlement agreement concerning the transfer to Genentech of certain materials related to hGH research. The situation leading to the agreement began in 1978 when two UC scientists consented to begin working for Genentech in early 1979. According to UC, these scientists wrongfully took with them to Genentech critical UC materials. According

---

1. Genentech states that the '877 patent specifically describes an intricate and technical method that allegedly would enable a person of ordinary skill in the recombinant DNA field to·induce bacteria to produce a medically useful human hormone. The method reportedly ·involves the isolation of human or animal messenger RNA coding for the production of a specific hormone from a cell that ordinarily produces the hormone; reverse transcribing the RNA to produce cDNA, a copy of the isolated RNA; inserting the copy into a transfer vector; and transforming bacteria to replicate the cDNA.

2. In this Court's May 2, 1994, Entry, we referred to the governmental agency providing funding for UC's research as the Department of Health, Education and Welfare (the HEW). *See* Granting in Part and Denying in Part Lilly's Motion to Dismiss Counts II–V and VII–VIII of Genentech's Amended Complaint, IP–90–1679–C (S.D.Ind. May 2, 1994). The parties in their papers filed with the Court had referred to the agency as the HEW. In Lilly's opposition to the instant motion, however, it refers to the agency as the United States Department of Health and Human Services (HHS). Lilly explains that the HEW was the predecessor agency to the HHS, and that the agency was the HHS at the time of the events giving rise to Genentech's allegations against UC and Lilly. Nonetheless, because all references to the agency in our previous Entry were to the HEW, we continue to refer to the agency as the HEW in today's Entry.

to Genentech, the scientists wrongfully were obligated to Lilly under consulting agreements during their final months at UC. The settlement of this dispute in 1980 required that UC notify Genentech if Lilly exercised its option in the 1978 option agreement or extended the term of such option.

The United States Patent and Trademark Office (PTO) issued the '877 patent to UC on December 14, 1982. Subsequently, UC and Lilly discovered that the '877 patent contained two errors in the DNA sequence of the gene coding for hGH—errors that Genentech alleges are critical. To correct the patent, on June 20, 1985, UC submitted to the PTO a petition for certificate of correction, a procedure intended for the correction of clerical errors only. *See* 35 U.S.C. § 255. The PTO issued a certificate of correction on November 15, 1985. Genentech alleges that the errors in the '877 patent were not clerical in nature and, thus, any attempted correction of them required a reissue proceeding.

In 1987, UC again applied for a waiver of the HEW's licensing restrictions, contending before the HEW that it anticipated litigation over the '877 patent and, therefore, needed the revenues that an exclusive license could bring. The HEW ultimately granted UC's request and, in March of 1989, UC issued to Lilly an exclusive license to the '877 patent. Under this license agreement, Lilly was not obligated to grant any sublicenses.

Cause number IP–90–1679–C was initiated on August 6, 1990, when Genentech filed suit against Lilly and UC in the District Court for the Southern District of Indiana. Genentech amended its Complaint on August 27, 1990, and in the Amended Complaint Genentech seeks a declaratory judgment that the '877 patent is invalid, noninfringed and unenforceable. The Amended Complaint also includes antitrust and pendent state law claims against both UC and Lilly.

On March 7, 1991, Lilly filed a motion to dismiss seeking dismissal of the various antitrust and state law counts Genentech lodged against Lilly. In a May 2, 1994, Entry, the Court granted Lilly's motion as to the antitrust claim Genentech lodged pursuant to § 1 of the Sherman Act; granted Lilly's motion regarding Genentech's claims lodged under § 2 of the Sherman Act insofar as such claims were premised on fraud on the HEW and on the Lilly–UC licensing arrangement, but denied Lilly's motion insofar as it was premised on fraud on the PTO; granted with prejudice Lilly's motion to dismiss Genentech's fraud claim; denied Lilly's motion to dismiss Genentech's third-party beneficiary claim; granted Lilly's motion to dismiss Genentech's unfair competition claim insofar as it was premised on the Lilly–UC licensing arrangement and on the misuse of Genentech's insulin technology, but denied the motion insofar as it was premised on UC's initiation of the California infringement action at Lilly's behest; and granted Lilly's motion to dismiss Genentech's claim for interference with contract and prospective economic advantage. *See* Entry Granting in Part and Denying in Part Lilly's Motion to Dismiss Counts II–V and VII–VIII of Genentech's Amended Complaint, Cause No. IP–90–1679–C (S.D.Ind. May 2, 1994).

Following the Court's May 2, 1994, Entry, Genentech filed its motion further to amend the Amended Complaint. Additionally, on June 6, 1994, UC filed a motion to dismiss counts II–VIII of the Amended Complaint. These two motions are the subjects of this Entry.

*Discussion*

The Court first will address Genentech's motion further to amend the Amended Complaint. Resolution of that motion encompasses resolution of the antitrust issues included in UC's motion to dismiss.

I. *Genentech's Motion to Amend the Amended Complaint*

Pursuant to Rule 15(a), Fed.R.Civ.P., Genentech has moved further to amend its Amended Complaint. Rule 15(a) stipulates that "leave [to amend] shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). However, the Seventh Circuit has cautioned that amendment under some circumstances is inappropriate:

[L]eave to amend is " 'inappropriate where there is undue delay, bad faith, dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments

previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment.'" (Citations omitted.) The assessment whether there is undue delay or undue prejudice, as well as the ultimate decision to grant or deny leave to amend, is within the district court's discretion.

*Daugherity v. Traylor Bros., Inc.*, 970 F.2d 348, 351 (7th Cir.1992) (citations omitted).

### A. Sherman Act Antitrust Claims

A brief look at the history of this case will be helpful in understanding a discussion regarding the antitrust claims Genentech has lodged against Lilly and UC. As stated previously, Genentech initiated this action on August 6, 1990, and amended its Complaint on August 27, 1990, not only seeking a declaratory judgment that the '877 patent is invalid, noninfringed and unenforceable, but also lodging antitrust and pendent state law claims against both UC and Lilly.

On February 4, 1991, the Court dismissed UC from the action. Subsequently, on July 1, 1993, UC again was made a party to this action when the Federal Circuit held that dismissal of UC was improper. *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931 (Fed. Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1126, 127 L.Ed.2d 434 (1994). In the Federal Circuit's opinion, the court addressed whether Genentech's antitrust and state law claims properly were raised in the present action, this Court having dismissed the antitrust and state law counts as barred by the Eleventh Amendment and the antitrust counts as barred by the State Action doctrine. The court held that those of Genentech's antitrust and state law counts determined to meet the criteria of defenses and compulsory counterclaims to UC's charge of patent infringement properly could be raised in the proceeding. *Genentech,* 998 F.2d at 948. This determination, the court held, was to be made by the district court on remand.

Immediately following such holding, however, the Federal Circuit chose specifically to address Genentech's antitrust claims against UC. It concluded that Genentech had failed to state an antitrust count against UC and, thus, affirmed the district court's dismissal of

the antitrust count. The Federal Circuit's opinion is not without some ambiguity. For example, in one section of its opinion, the court refers to "antitrust claims" (in the plural), while in another section the court affirms the dismissal of Genentech's "antitrust count." In the Amended Complaint, Genentech lodged not one, but two Sherman Act antitrust counts—one regarding a § 1 violation; the other, a § 2 violation. The language of the § 2 count, however, did not make clear whether such count was lodged against both UC and Lilly or against only Lilly. As a preliminary determination to the Court's May 2, 1994, Entry, we interpreted the Amended Complaint to assert a § 2 claim against only Lilly. Thus, we read the Federal Circuit's opinion in which it affirmed dismissal of UC as encompassing only Genentech's § 1 antitrust claim.

When this Court was considering Lilly's motion to dismiss, we examined Genentech's Amended Complaint and concluded that the alleged conduct of fraud on the PTO stated a § 2 antitrust claim against Lilly. At the same time, we considered the Federal Circuit's dismissal of UC on the § 1 count and held that such action mandated our dismissal of Lilly from a § 1 count, given that the conduct alleged against both parties largely was the same. On further reflection, we have determined that dismissal of the § 1 count against Lilly was premature. This change in position is premised upon our opinion that the Federal Circuit, in its affirmation of UC's dismissal, failed to consider UC's alleged fraudulent activity before the PTO. Although the Federal Circuit mentioned these allegations of fraud in outlining the facts of the case, yet in its discussion section it did not address those allegations in the context of a *Walker Process* antitrust claim. *See Walker Process Equip. Inc., v. Food Machs. & Chem. Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965) (holding that procurement of a patent by fraud on the PTO may be anticompetitive conduct for purposes of the Sherman Act). As we stated in our May 2, 1994, Entry, we believe that such allegations against UC and Lilly do lay the groundwork for an antitrust claim based on *Walker Process.* This being so, we believe

such conduct also supports a § 1 claim and conclude that we incorrectly dismissed the § 1 claim against Lilly.

■ The reinstatement of the § 1 claim against Lilly, however, cannot revive the § 1 claim against UC. Genentech chose to appeal the dismissal of such count to the Federal Circuit and that court affirmed the district court, albeit on a different ground. Moreover, Genentech petitioned the Federal Circuit for a rehearing regarding the antitrust counts, and on September 13, 1993, the Federal Circuit denied Genentech's request. Finally, on February 22, 1994, the United States Supreme Court denied a petition for certiorari in the case. *Regents of the Univ. of Cal. v. Genentech, Inc.,* — U.S. —, 114 S.Ct. 1126, 127 L.Ed.2d 434 (1994). Based on this case history, we believe Genentech's window of opportunity to seek amendment or reinstatement of its § 1 antitrust count against UC has passed. Thus, Genentech's motion to amend its Amended Complaint properly to assert a § 1 antitrust claim against UC must be denied.

■ Furthermore, even if we were to find that amendment was not barred by the history of the case, the following discussion, concluding that Genentech is prohibited from amending to state a § 2 claim against UC, provides an additional reason for denying Genentech leave to amend to state a § 1 claim. This discussion focuses on the final antitrust issue against UC—the § 2 antitrust count Genentech wishes to amend its Amended Complaint to state against UC. For the following reasons, we believe such amendment would be futile.

The United States Supreme Court has held that "with the possible market participant exception, *any* action that qualifies as state action is 'ipso facto ... exempt from the operation of the antitrust laws.'" *City of Columbia and Columbia Outdoor Advertising, Inc. v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 379, 111 S.Ct. 1344, 1353, 113 L.Ed.2d 382, 397 (1991) (citations omitted). Thus, to determine if UC's alleged anticompetitive conduct is actionable under the Sherman Act, we first must decide if the challenged conduct qualifies as state action.

UC argues that it is "a branch of the state government equal and coordinate with the legislature, the judiciary, and the executive." UC's Mem. in Opp'n to Mot. for Leave to Amend at 11. As such, UC continues, its actions are those of the state and, thus, are protected from Sherman Act liability through *Parker* immunity. *See Parker v. Brown,* 317 U.S. 341, 350–51, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943) (holding that "[w]e find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature."). However, the following discussion renders it unnecessary for us to decide whether we agree that California's recognition of UC as an arm of the State qualifies all of UC's actions as state action.

In *Community Communications Co., Inc. v. City of Boulder, Colo.,* 455 U.S. 40, 51, 102 S.Ct. 835, 840–41, 70 L.Ed.2d 810, 818–19 (1982), the Supreme Court described two circumstances in which *Parker* immunity was available. First, the Court noted that immunity was available when the challenged act constitutes the action of the State itself in its sovereign capacity. *Id.* at 52, 102 S.Ct. at 841, 70 L.Ed.2d at 819. Second, the Court stated that antitrust immunity was available when the challenged act constitutes action "in furtherance or implementation of clearly articulated and affirmatively expressed state policy." *Id.*

■ Therefore, to determine if an entity falls into the latter category, a court must examine the state policy in issue to decide if it presents a clearly articulated and affirmatively expressed state policy authorizing or contemplating the questioned conduct. In *Boulder,* the Court explained that to meet this standard the state policy cannot be one of mere neutrality respecting the challenged actions. *Id.* at 55, 102 S.Ct. at 842–43, 70 L.Ed.2d at 821. Rather, it appears that the state policy must be more explicit in its delegation of authority. For example, in *Omni,* 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382, a statute authorizing cities to regulate the use of land and the construction of buildings and other structures within their boundaries was found, as a matter of state

law, to authorize the city to regulate billboards, and *Parker* immunity was found applicable.

The *Omni* Court also stated that in order to qualify for a *Parker* defense, the conduct must be guided by a state policy containing "authority to suppress competition—more specifically, 'clear articulation of a state policy to authorize anticompetitive conduct'" by the entity in connection with its regulation. *Omni*, 499 U.S. at 372, 111 S.Ct. at 1350, 113 L.Ed.2d at 393 (citation omitted). This authorization, however, need not be stated explicitly in the delegating statute. *Id.* "It is enough ... if suppression of competition is the 'foreseeable result' of what the statute authorizes." *Id.* at 373, 111 S.Ct. at 1350, 113 L.Ed.2d at 393. Thus, to determine if UC falls into the second category for which *Parker* immunity is available, we not only must examine the state policy authorizing UC's challenged conduct to decide if the State contemplated such acts, but we also must consider whether that policy authorized anticompetitive conduct.

An examination of three of California's statutes leads us to conclude that the State did contemplate UC's challenged conduct.[3] Clearly, the language of these statutes illustrates that the legislature authorized UC to enter into an agreement such as the license agreement with Lilly. Although a precise reference to patents is not included, yet the legislature's reference to "any real or personal property" in Cal.Educ.Code § 92431 certainly encompasses UC's interest in patents.

■ Genentech counters that UC's actions, including its alleged fraudulent activity before the PTO and asserted participation in lodging a bad faith infringement action against Genentech, were not legitimate state actions and, thus, the state action doctrine is inapplicable. We, however, are unpersuaded by this argument. In *Omni*, the Court recognized it could be argued that an entity "acts beyond delegated authority, for Parker purposes, whenever the nature of its regulation is substantively or even procedurally defective." *Omni*, 499 U.S. at 371, 111 S.Ct. at 1349, 113 L.Ed.2d at 392. The Court, however, eschewed such an expansive interpretation of the *Parker*-defense authorization requirement as having unacceptable consequences.

"To be sure, state law 'authorizes' only agency decisions that are substantively and procedurally correct. Errors of fact, law, or judgment by the agency are not 'authorized.' Erroneous acts or decisions are subject to reversal by superior tribunals because unauthorized. If the antitrust court demands unqualified 'authority' in this sense, it inevitably becomes the standard reviewer not only of federal agency activity but also of state and local activity whenever it is alleged that the governmental body, though possessing the power to engage in the challenged conduct, has actually exercised its power in a manner not authorized by state law. We should not lightly assume that *Lafayette's* [*v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978)] authorization requirement dictates transformation of state administrative review into a federal antitrust job. Yet that would be the consequence of making antitrust liability depend on an undiscriminating and mechanical demand for 'authority' in the full administrative law sense." P. Areeda & H. Hovenkamp, Antitrust Law ¶ 212.3b, p 145 (Supp 1989).

*Omni*, 499 U.S. at 371–72, 111 S.Ct. at 1349–50, 113 L.Ed.2d at 392–93.

---

**3.** Cal.Educ.Code § 92431 provides:
 The regents may acquire by grant, purchase, gift, devise, lease, or by the exercise of the right of eminent domain, and may hold, use, sell, lease, or dispose of any real or personal property necessary for the full exercise or convenient or useful for the carrying on of any of its powers pursuant to this chapter.
 Cal.Educ.Code § 92432 stipulates:
 The regents may construct, own, operate, and control any project.

Cal.Educ.Code § 92437 provides:
 The regents may make contracts, leases, and agreements with any person or public corporation, political subdivision, city, county, district, or any agency of any person or such entity and may generally perform all acts necessary for the full exercise of the powers vested in the regents.

■ The Court concluded that determination of a political subdivision's authority to act, for *Parker* purposes, requires application of a broader concept of authority than that which is applied to determine the legality of the entity's action under state law. *See Allright Colorado, Inc. v. City and County of Denver*, 937 F.2d 1502, 1511 (10th Cir.) (rejecting the argument that alleged errors or abuses in the implementation of state law should expose the City to antitrust liability), *cert. denied*, 502 U.S. 983, 112 S.Ct. 587, 116 L.Ed.2d 612 (1991). In the instant case, we believe the California legislature's delegation of power to UC to manage the University's property establishes UC's actions as actions of the State and find that any alleged abuse of that delegation of power fails to destroy UC's *Parker* immunity. Thus, we turn briefly to the final consideration—whether the state policy authorized anticompetitive conduct. We believe that it did.

As previously stated, the authorization of anticompetitive conduct does not have to be explicit. If it is the "foreseeable result" of the delegating statute, this prong is met. The legislature's delegation of power to UC includes the power to manage all the University's real and personal property. Certainly, the legislature contemplated that such property would include patents resulting from University research. Patents, by definition, are anticompetitive in nature. Thus, we conclude that anticompetitive conduct was the "foreseeable result" of that which is authorized by the statutes in issue.

■ Next, Genentech contends that even if UC's conduct qualifies as state action, the market participant exception operates to remove UC from *Parker* protection. Genentech asserts that UC was engaging in profit-making activity in the national market for hGH. Moreover, Genentech argues, UC's licensing of hGH technology that its employees developed is not related to owning and managing property in connection with its sovereign function.

■ We do not agree with Genentech that UC's licensing of patents is unrelated to its duty to own and manage the University's property. To the contrary, it appears to be

an integral function of an educational institution involved in research activity. Licensing patents arising from University research is a natural outgrowth of UC's statutory obligation to own and manage the institution's property. We are not convinced that in licensing its patents, UC has transformed itself into a market participant. Thus, even were we inclined to apply a market participant exception to *Parker* immunity, the facts of this particular case would not warrant its application. We, however, join the Eighth and Tenth Circuits in their refusal to recognize any such exception.

In a recent opinion, the Supreme Court suggested in dicta that there may be a market participant exception to state immunity. *See City of Columbia and Columbia Outdoor Advertising v. Omni Outdoor Advertising*, 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). As yet, however, the market participant exception is merely a suggestion and is not a rule of law.

*Paragould Cablevision v. City of Paragould, Ark.*, 930 F.2d 1310 (8th Cir.), *cert. denied*, 502 U.S. 963, 112 S.Ct. 430, 116 L.Ed.2d 450 (1991). The *Paragould* court refused to apply a market participant exception. *See also Allright Colorado*, 937 F.2d at 1510 (holding that "the City's additional status as a possible competitor, or its possible engagement in a 'proprietary' activity, is not determinative."). Hence, we conclude that the state action doctrine immunizes UC against antitrust liability, and Genentech's motion to amend to state an antitrust claim against UC is denied.

■ Still in the context of antitrust claims, we now address Genentech's desire further to amend its Amended Complaint to "clearly and unequivocally allege that Lilly and UC conspired and combined to ... (b) obtain a waiver of the nonexclusive licensing requirement through materially fraudulent misrepresentations and omissions to HEW...." Genentech's Mem. at 14. As earlier explained, this Court found in its May 2, 1994, Entry, that Genentech had not pled facts

that supported its claim that Lilly and UC committed fraud on the HEW.[4]

An examination of Genentech's new evidence leads us again to conclude that Genentech has failed to plead facts that support a claim for fraud on the HEW. In support of amendment, Genentech points to the deposition testimony of Leroy Randall (Randall), former chief of the patent branch in the HEW's Office of General Counsel. Genentech contends that Randall's testimony indicates that UC misled the HEW in UC's quest for permission to license the '877 patent exclusively when UC reported that nonexclusive licensing appeared "unattractive." Additionally, Genentech argues that newly discovered evidence reveals that UC failed to report to the HEW certain requests it had received from companies for licenses or sublicenses to the '877 patent. Such failure, Genentech claims, prevented the HEW from obtaining material relevant to its decision of whether to permit UC to license the '877 exclusively.

Our previous decision that Genentech had failed to state a claim of fraud on the HEW was based on the conclusion that UC's statement to the HEW that nonexclusive licensing was "unattractive" was opinion rather than fact and, thus, not actionable as fraud. Today, we list an additional reason why UC's alleged statements and omissions as reported by Genentech could not constitute fraud on the HEW in UC's ascertainment of permission to license the '877 exclusively.

According to an April 21, 1988, memorandum from Randall to the assistant secretary for health, Executive Order Numbers 12,591 and 12,618 provided the criteria for determining whether the HEW should grant UC's request for permission to license the '877 patent exclusively.[5] A reading of Executive Order Number 12,618 indicates that the HEW only was bound by licensing limitations in certain situations, i.e., those in which the subject invention had not been marketed adequately. This Executive Order was an outgrowth of Public Law 98–620, which law in 1984 amended 35 U.S.C. § 202(c)(7). Before the amendment and at the time UC's first request for permission to license exclusively was denied, the HEW apparently more narrowly was constrained in its authority to permit nonprofit owners of patents and licenses to inventions made with federal assistance to license exclusively. Significant to this discussion is Randall's statement in the memorandum that: "We believe it is clear from the documentation in the subject case file that the University of California and its exclusive licensee have taken adequate steps to market the invention and that approval of the University's petition to administer the invention under Public Law 98–620 is, therefore, mandated by the two Executive Orders." *Id.*

Lilly argues that Randall's memorandum clearly illustrates that he is aware that UC already exclusively had licensed the '877 to Lilly. Moreover, Lilly contends that, under the criteria established in the Executive Orders in issue, the only factors relevant to the HEW's decision to permit exclusive licensing

---

4. As our previous discussion explains, Genentech cannot maintain an antitrust claim against UC in this cause of action. Thus, references to UC's conduct in this context is significant only in describing fully the factual allegations supporting Genentech's antitrust claims against Lilly.

5. Executive Order 12,591 is denominated "Facilitating Access to Science and Technology" and is dated April 10, 1987. Lilly Ex. 6. Executive Order 12,618 is designated "Uniform Treatment of Federally Funded Inventions" and is dated December 22, 1987. The latter Executive Order added a new subsection to the former, which subsection in relevant part provided:

(b) The head of each Executive department and agency shall, within overall funding allocations and to the extent permitted by law:

. . . . .

(5) administer all patents and licenses to inventions made with federal assistance, which

are owned by the non-profit contractor or grantee, in accordance with Section 202(c)(7) of Title 35 of the United States Code as amended by Public Law 98–620, without regard to limitations on licensing found in that section prior to amendment or in Institutional Patent Agreements now in effect that were entered into before that law was enacted on November 8, 1984, unless, in the case of an invention that has not been marketed, the funding agency determines, based on information in its files, that the contractor or grantee has not taken adequate steps to market the inventions, in accordance with applicable law or an Institutional Patent Agreement; . . . .

Exec. Order No. 12,618, 52 Fed.Reg. 48,661, 1987 WL 181454 (Dec. 22, 1987).

of the '877 was whether adequate steps had been taken to market the invention of the '877 patent. Thus, Lilly reasons, whether UC had received other requests for licenses or sublicenses was immaterial to the HEW's ultimate determination.

Genentech asserts that UC's alleged failure to inform the HEW about certain licensing requests by other companies was relevant to the HEW's decision to permit exclusive licensing of the '877 patent. In establishing relevancy, Genentech argues that the reference to "market the invention" in Executive Order Number 12,618 really means "market the patent." By interchanging the words "invention" and "patent," Genentech contends that Executive Order Number 12,-618 placed upon UC an obligation to market the '877 *patent* rather than to market the *invention* of the '877 patent.

We disagree with Genentech. Executive Order Number 12,618 arose from Public Law 98–620. An examination of the language of other subsections of Public Law 98–620 clearly illustrates that its drafters distinguished use of the words "patent" and "invention." "Patent" was used when the drafters were referring to a patent on a subject invention and "invention" was used when they were referring to the invention that was the result of federal funding. For example, another subsection in Public Law 98–620 provides as follows:

(5) by amending paragraphs (1), (2), (3), and (4) of section 202(c) to read as follows:

. . . . .

(2) That the contractor make a written election within two years after disclosure to the Federal agency ... whether the contractor will retain title to a subject invention: *Provided,* That in any case where publication, on sale, or public use, has initiated the one year statutory period in which valid patent protection can still be obtained in the United States, the period for election may be shortened....

Public Law 98–620, § 501(5).

Obviously, the words "patent" and "invention" are not interchangeable in this subsection. There are other such instances that we could quote from the public law, but we find

it unnecessary. We are convinced that had the drafters meant "market the patent" as Genentech suggests, they certainly would have used that phrase rather than "market the invention."

We believe the meaning of the relevant governing material is clear. Moreover, Randall's April, 21, 1988, memorandum indicates that the HEW was secure in its belief that UC and Lilly had taken adequate steps to market the invention. Finally, Genentech makes no other arguments to counter Lilly's position that Genentech's new evidence is irrelevant to the HEW's final decision on exclusive licensing of the '877 patent. We, therefore, conclude that the HEW's decision to permit UC to license the '877 patent exclusively did not arise from fraud as alleged by Genentech. Therefore, such allegations cannot serve as a basis for an antitrust claim. For these reasons, we deny Genentech's request for leave further to amend its Amended Complaint to restate a claim of fraud on the HEW against Lilly in the HEW's ultimate decision to permit UC to license the '877 exclusively.

Finally, in the area of antitrust, Genentech moves for leave to amend its Amended Complaint in order to "clearly and unequivocally allege[ ] that Lilly and UC conspired and combined to ... (c) assert the fraudulently corrected '877 patent against Genentech in a bad faith, harassing litigation, with knowledge that the '877 patent was invalid and unenforceable." Genentech admits that in its Amended Complaint it did not make the specific allegation that UC and Lilly asserted the '877 against Genentech *with knowledge that the patent was invalid and unenforceable.*

According to Genentech, it requests the proposed amendment so that it may pursue a § 2 Sherman Act claim under the theory found in *Handgards, Inc. v. Ethicon, Inc.* 743 F.2d 1282, 1288 (9th Cir.1984), *cert. denied,* 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985). That theory holds that a party, who actually knows that a patent is invalid, unenforceable, or not infringed and who nevertheless brings an action to enforce the patent, may have engaged in predatory conduct for purposes of attempted monopolization. *Id.*

Lilly argues that prior to Genentech's motion for leave further to amend, Genentech had only alleged an antitrust claim based on *Walker Process Equipment, Inc. v. Food Machines & Chemical Corp.*, which encompasses procurement of a patent by fraud on the PTO.[6] 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). Lilly contends that through April 27, 1994, neither Genentech's filed documents nor its contention interrogatories indicated that Genentech was alleging *Handgards*-type conduct against Lilly.

Genentech counters that Lilly has known since 1991 that Genentech was asserting *Handgards*-type antitrust claims. Genentech alleges that it reported its intention of seeking relief based on *Handgards*-type conduct in its brief in opposition to Lilly's motion to dismiss as well as in its answers to certain interrogatories Lilly propounded. Moreover, Genentech alleges newly discovered evidence serves as a basis for asserting a *Handgards*-type antitrust claim.

■ First, the Court notes that the Federal Rules of Civil Procedure require "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R.Civ.P. 8. The Seventh Circuit has stated that Rule 8 mandates only "a generalized statement of the facts from which the defendant can craft a responsive pleading." *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417, 421 n. 5 (7th Cir.1994).

> Further, the district court has a duty to consider whether a plaintiff's allegations could provide relief under *any* available legal theory. The complaint need not support a viable claim only under the particular legal theory intended by the plaintiff.

*Id.* at 421 (citing Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990). We find that Genentech's Amended Complaint includes factual allegations in support of its Sherman Act counts against Lilly. We do not believe that Genentech's failure specifically to include in the Amended Complaint its intent to pursue a *Handgards* theory of recovery prevents it from so doing. Thus, we examine the

Amended Complaint for conduct supportive of this theory.

■ The Court already has determined that there was no fraud on the HEW in the issuance of the nonexclusive license waiver. Thus, this alleged conduct cannot support a *Handgards* theory. Additionally, we hold fast to our previous decision that there was nothing anticompetitive about the licensing arrangement between UC and Lilly. *See* Entry Granting in Part and Denying in Part Lilly's Motion to Dismiss Counts II–V and VII–VIII of Genentech's Amended Complaint, IP–90–1679–C (S.D.Ind. May 2, 1994) (holding that "UC, as the patentee, has the right to exclusivity, the right to transfer, and the right to sue infringers ... In addition, it is routine for an exclusive licensee to require that the patentee agree to enforce its patent against infringers.") As the Federal Circuit stated when the same licensing arrangement was before it in *Genentech, Inc.:*

> The patenting and licensing of the results of University research is not a violation of antitrust principles, and the grant of an exclusive license is a lawful incident of the right to exclude provided by the Patent Act. The University's right to select its licensees, the decision to grant exclusive or non-exclusive licenses or to sue for infringement, and the pursuit of optimum royalty income, are not of themselves acts in restraint of trade. Although Genentech presses the position that the University and Lilly conspired to exclude Genentech from the hGH market, Genentech's pleading does not allege more substance than the University's grant of an exclusive license to Lilly
>
> . . . .

*Genentech, Inc.*, 998 F.2d at 949.

The facts Genentech alleges in its proposed Second Amended Complaint regarding the UC–Lilly licensing arrangement after the HEW waiver was granted are nearly identical to those in its Amended Complaint. Thus, Genentech has presented nothing new that would cause the Court to disturb its previous holding that the exclusive licensing

6. In a May 2, 1994, Entry, this Court found that Genentech had stated an antitrust claim against Lilly based on allegations of fraud on the PTO.

arrangement between UC and Lilly does not support Genentech's § 2 antitrust claim based on a *Handgards* theory. Consequently, thus far, the only conduct supporting a § 2 claim is fraud on the PTO. Although the parties have not debated whether Lilly and UC's alleged fraud on the PTO could be used to support Genentech's *Handgards* antitrust theory as well as its *Walker Process* theory, yet the following discussion eliminates any need for the Court to address this possibility.

Genentech contends that recent discovery has revealed new and different conduct that supports a *Handgards* antitrust claim. Specifically, Genentech focuses on a January 1980 written legal opinion from former UC patent counsel, the law firm of Irons and Sears.[7] According to Genentech, the Irons opinion provides "indisputable proof that UC was informed as early as 1980 that its '877 patent was invalid and unenforceable." Genentech's Reply at 27. Additionally, Genentech alleges that Lilly was cognizant of the Irons opinion by 1984, long before UC— reportedly at Lilly's behest—initiated a bad faith infringement action against Genentech based on the '877 patent.

Only through fairly recent discovery has Genentech become aware of this evidence. Thus, the Amended Complaint could not have included these allegations in support of *Handgards*-type conduct. Because this evidence is new and only recently discovered— the Court did not enter its denial of UC's motion for return of the Irons opinion until March 22, 1994—we believe Genentech should not be barred from using it to support its antitrust claims. We are convinced that no undue prejudice will result from inclusion of this *Handgards*-type conduct. Moreover, any possible prejudice can be remedied by an extension of discovery.[8]

Thus, we believe that Genentech's request to amend the Amended Complaint to include recently discovered conduct arising from the Irons opinion is proper, and we grant such request.

### B. Lilly's Alleged Misuse of Genentech Insulin Technology

In Lilly's motion to dismiss, the subject of our May 2, 1994, Entry, Lilly argued that to the extent Genentech's statutory unfair competition claim was based on Lilly's alleged misuse of Genentech's insulin technology, it was duplicative of one of Genentech's claims in another of these consolidated cases—cause number IP–88–1463–C. We agreed with Lilly that the conduct regarding misuse is being used to support an unfair competition claim in cause number IP–88–1463–C, and precluded Genentech from further using such conduct to support its unfair competition claim in the instant suit.

Genentech, in the instant motion, requests that the Court reconsider such determination because "Genentech's amended complaint alleged these facts in support of its antitrust claims as well as the Unfair Competition Claim." Genentech's Mem. in Supp. of Mot. for Leave to Amend at 8. Following another examination of the Amended Complaint, our position on Genentech's attempted use of Lilly's alleged insulin misuse to support unfair competition claims in two separate actions remains unchanged. Both actions are before this Court, and we believe it proper to entertain the alleged conduct in support of the unfair competition claim in the first filed action—IP–88–1463–C.

In its Amended Complaint, Genentech also alleged Lilly's misuse of Genentech's insulin technology in support of its antitrust claims. In paragraph eighteen of its Amended Complaint, Genentech asserted such conduct. Moreover, in support of its antitrust claims against Lilly in counts two and three, Genentech clearly referenced paragraph eighteen.

---

7. The Irons opinion was one of many documents that was the subject of an Entry this Court issued regarding inadvertently produced documents. *See* Entry Denying UC's Motion for Return of Inadvertently Produced Documents; Denying Genentech's Emergency Motion to Compel the Return of Inadvertently Produced Documents; and Granting in Part and Denying in Part Lilly's Motion to Compel the Return of Inadvertently

Produced Privileged Documents, Docket No. 912, 1994 WL 270712 (S.D.Ind. March 22, 1994). In that Entry, the Court denied, *inter alia*, UC's request for return of that document.

8. Fact discovery in this case currently is slated to close on November 30, 1994.

In Lilly's memorandum in support of its motion to dismiss, Lilly asserted that Genentech could not base antitrust violations on, *inter alia,* Lilly's alleged misuse of Genentech's insulin technology or on Lilly's reported concealment of that misuse because such allegations did not assert the requisite injury to competition. Lilly's Mem. in Supp. of Mot. to Dismiss at 7 n. 2. In its opposition to Lilly's motion to dismiss, Genentech failed to respond to Lilly's assertion.

Although Genentech argues that Lilly's alleged insulin misuse is part of a larger scheme by Lilly and UC to injure competition, the only "larger scheme" viable for purposes of antitrust claims in this action is Lilly and UC's alleged fraud on the PTO and Lilly and UC's alleged bad faith enforcement action. In light of this, we are convinced that Lilly's reported misuse of Genentech's insulin technology could not support Genentech's antitrust claims. We elaborate.

In Genentech's *Walker Process* claim, the alleged fraud on the PTO provides the requisite anticompetitive conduct for stating such a claim; in Genentech's *Handgards* claim, the alleged bad faith enforcement action provides this type conduct. Additionally, to be successful in either of these antitrust claims, Genentech must prove that Lilly's conduct satisfied the other requirements of the asserted antitrust claims. Specifically, for a § 2 Sherman Act claim, Genentech also must establish specific intent to achieve monopoly power and a dangerous probability that the attempt to monopolize will be successful. *Indiana Grocery v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1413 (7th Cir.1989). Genentech also must show some antitrust injury. *See* 15 U.S.C. § 15. To succeed in a § 1 Sherman Act claim, Genentech must establish "(1) the existence of a conspiracy (2) affecting interstate commerce (3) that imposes an 'unreasonable' restraint of trade." *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 961 F.2d 1148 (5th Cir.1992) (citation omitted), *cert. denied,* — U.S. —, 113 S.Ct. 1046, 122 L.Ed.2d 355 (1993).

Lilly's alleged misuse of insulin technology has no relation to either of these antitrust theories. If a finder of fact determined that fraud on the PTO or a bad faith enforcement action satisfied the anticompetitive conduct prong of a § 2 claim, the misuse evidence could not be used to support any of the other elements outlined above. Moreover, should the finder of fact determine that neither fraud on the PTO nor a bad faith enforcement action fulfills the anticompetitive conduct prong, obviously Lilly's alleged misuse of insulin technology alone would not rise to the level of a § 2 antitrust violation.

Finally, if neither *Walker Process-* nor *Handgards*-type liability is found, Lilly's alleged misuse of Genentech's insulin technology alone could not support a § 1 conspiracy claim because Genentech alleges this misuse against Lilly only. As previously indicated, a § 1 claim requires the existence of a conspiracy.

For these reasons, we conclude that Genentech's allegations of Lilly's insulin misuse do not support an antitrust claim. We believe the proper case in which Genentech should litigate its insulin misuse allegations against Lilly is in the earlier filed cause number—IP–88–1463–C. Thus, the issue of insulin misuse is dismissed from the instant action.

### C. Lilly's Alleged Disparagement

 Genentech seeks leave further to amend the Amended Complaint in order to "plead[ ] with substantially greater specificity Genentech's allegations that Lilly disparaged Genentech and its Protropin product." Genentech's Mem. in Supp. of Mot. for Leave to Amend at 14. Genentech asserts that it has new evidence of disparagement to support its antitrust claims against Lilly, and that the new disparagement evidence also should serve as an additional basis to maintain its statutory unfair competition claim against Lilly. Moreover, Genentech seeks to add a new common law unfair competition claim against Lilly based in part on this evidence and a trade libel claim against Lilly based wholly on this evidence.

Lilly argues that Genentech long has known about the activities Genentech describes as disparagement. In addition, Lilly contends that permitting Genentech, this late in the day, to add allegations of disparage-

ment to the host of conduct already in issue unduly would prejudice Lilly in this action.

Concerning disparagement activity, Genentech's Amended Complaint merely stated that Lilly, aided and abetted by UC, "disparag[ed] Genentech and its ability to develop a safe and effective hGH product in various direct and indirect contacts with the FDA and others...." Am. Compl. at 11. Genentech failed to elaborate further about any alleged disparagement in its thirty-one page Amended Complaint. Moreover, when Genentech countered Lilly's motion to dismiss, Genentech did not present arguments pertaining to disparagement activity. The aforequoted single sentence in Genentech's Amended Complaint was the only information provided the Court regarding disparagement. In fact, in the evidence Genentech and Lilly filed in conjunction with the instant motion, the Court can find no reference to disparagement dated before Genentech's February 11, 1994, responses to UC's first set of interrogatories. *See* Lilly's Ex. 12.

This Court stayed discovery on the issue of disparagement in May, 1994, when the parties brought to the Court their disagreement as to the status of such discovery. Lilly argued that the Court's May 2, 1994, Entry implicitly dismissed disparagement from the case; Genentech argued to the contrary. The Court's stay was based on its belief that the Amended Complaint contained nothing more than a conclusory allegation regarding disparagement—a belief we continue to hold. Genentech now brings to the Court additional evidence of disparagement, contending that only through recent discovery has it come to appreciate the effects of Lilly's alleged disparagement activities. We believe, however, that the "new" evidence Genentech offers largely is cumulative. Certainly, the record indicates that when Genentech filed its Amended Complaint in 1990, the activities it now seeks to make a part of this action were no secret. If Genentech intended to make such alleged conduct a part of this litigation in 1990, clearly it could have done

so leaving no measure of doubt that a claim of disparagement, indeed, was included.

There are six cases involved in this multidistrict litigation. The first was filed in 1987. Years have passed, and we still are in the discovery phase. Fact discovery is scheduled to close November 30, 1994. Our decision *infra* that the Irons opinion is new and relevant evidence potentially could extend this deadline—one that already has been extended several times since this Court's Order of July 23, 1993.[9] Initially, the Court established April 18, 1994, as the date for completion of all discovery other than that related to expert witnesses. At present, we have granted more than a seven-month extension. To permit Genentech to amend its Amended Complaint so that it includes an issue that originally could have been brought would extend the pretrial phase of this litigation far beyond an acceptable limit. In order that we eventually might reach the trial phase of this litigation, we must begin focusing on what already properly has been pleaded. We are convinced that disparagement conduct does not fall into this category, and we are persuaded that the evidence Genentech recently has ascertained is primarily cumulative.

For these reasons, we believe that permitting Genentech to add to this case conduct of which Genentech was well aware long before the Amended Complaint was filed would be unduly prejudicial to its opponents. The undue prejudice would extend not only to Lilly against whom the eleventh-hour charge is made, but also to UC, whose right to a final judgment wrongfully would be postponed. This decision, of course, does not preclude Genentech from lodging claims based on Lilly's alleged disparagement activity in a separate action.

### D. Statutory and Common Law Unfair Competition Claims and Trade Libel Claim

Our determination that Genentech waited too long to allege disparagement activity against Lilly disposes of any need to discuss Genentech's proposed trade libel claim as

---

**9.** This Order established a schedule for the completion of the pretrial phase of these consolidated civil actions.

that claim was grounded solely in Lilly's alleged disparaging conduct. Moreover, disparagement activity will not be recognized in this litigation as an additional basis for Genentech's statutory unfair competition claim.

██ Furthermore, that evidence will not be admissible to support Genentech's proposed common law unfair competition claim. However, to the extent that Genentech seeks to amend to add a common law unfair competition claim based on conduct already pleaded, we believe such amendment is proper. The conduct supporting Genentech's statutory unfair competition claim apparently is the same conduct that will support its common law unfair competition claim. It is true that the latter, in contrast to the former, permits recovery of damages. However, we do not believe that damages discovery in this action has progressed so far that the addition of damages discovery in the context of common law unfair competition will be unduly prejudicial to Lilly. Hence, Genentech's motion for leave to amend the Amended Complaint to include a common law unfair competition claim is granted.

██ Finally, we must address both Genentech's common law and statutory unfair competition claims in the context of supporting evidence. In our May 2, 1994, Entry, we held that Genentech had stated a statutory unfair competition claim based on the alleged bad faith infringement action Lilly reportedly forced UC to initiate against Genentech. When we upheld Genentech's statutory unfair competition claim in our May 2, 1994, Entry, the only conduct stated to support the bad faith infringement action was Lilly and UC's alleged fraud on the PTO. Earlier in this Entry, we determined not only that Genentech may assert a common law unfair competition claim against Lilly, but also that the Irons opinion constituted new evidence not formerly available to Genentech. In light of the latter finding, we concluded that Genentech could use the Irons opinion in support of its § 2 antitrust claim against Lilly. In addition, we believe that Genentech properly may use the Irons opinion in the context of its unfair competition claims.

In sum, Genentech's motion for leave to amend its Amended Complaint to add a new trade libel count is denied. However, Genentech's request to add a new common law unfair competition count and request to use the Irons opinion as further support for its unfair competition claims are granted.

### E. UC's Alleged Breach of the 1980 Settlement Agreement with Genentech

Lastly, in its motion further to amend the Amended Complaint Genentech wishes to add language in order to restate and to clarify its claim against UC for UC's alleged breach of the 1980 settlement agreement between UC and Genentech. We will discuss this request in the following section in which we address UC's motion to dismiss.

## II. UC's Motion to Dismiss Counts II–VIII of Genentech's Amended Complaint

As is apparent from the previous section, resolution of Genentech's motion to amend the Amended Complaint disposed of any need for the Court to discuss either count II or count III—the § 1 and § 2 antitrust claims against UC—in the context of UC's motion to dismiss. Such claims against UC are dismissed. We turn now to the remaining issues in UC's motion to dismiss.

### A. Count IV—Fraud

In our May 2, 1994, Entry, we dismissed Genentech's fraud claim against Lilly with prejudice because Genentech did not allege facts to support all the elements of the tort of fraud. Specifically, we found that Genentech failed to allege that Lilly misrepresented or fraudulently concealed facts from Genentech.

In UC's motion to dismiss, UC contends that Genentech has not stated a claim of fraud. In Genentech's opposition to UC's motion, Genentech apparently concedes that it failed to state a fraud claim against UC. Rather than arguing that it had stated such a claim, Genentech merely notes that its proposed Second Amended Complaint does not assert a fraud claim against UC. Genentech's Opp'n at 2. Genentech's acquiescence in UC's position prompts us to grant UC's motion to dismiss count IV.

### B. Count V—Third-party Beneficiary

Genentech alleges that it was a third-party beneficiary to the 1978 option agreement between UC and Lilly and to the 1980 IPA between UC and the HEW. Genentech contends that when these agreements subsequently were modified to eliminate the requirement of nonexclusive licensing, it—as an alleged third-party beneficiary of that requirement—was injured. Apparently, Genentech's argument is that had the nonexclusive licensing provisions remained unaltered, Genentech would have had a right to obtain a license to the '877 patent—a right that would have precluded UC from alleging Genentech infringed the '877.

■ The Federal Circuit made this Court's task on remand quite clear: we are to determine which of Genentech's counts meet the criteria of defenses and compulsory counterclaims to UC's charge of patent infringement. *Genentech, Inc.*, 998 F.2d at 948. Those that do properly are raised in this proceeding. Thus, we first must determine if Genentech's third-party beneficiary claim is compulsory or permissive.

■ A compulsory counterclaim is one that "arises out of the transaction or occurrence" that forms the basis of an opponent's claim. Fed.R.Civ.P. 13(a); *see Colonial Penn Life Ins. v. Hallmark Inc.*, 31 F.3d 445, 448 (7th Cir.1994). A defendant is required to plead any compulsory counterclaim or forever is barred from bringing suit on such claim. The Seventh Circuit has described Rule 13(a) as a rule designed to foster judicial economy. *See Martino v. McDonald's Sys., Inc.*, 598 F.2d 1079, 1082 (7th Cir.), *cert. denied*, 444 U.S. 966, 100 S.Ct. 455, 62 L.Ed.2d 379 (1979).

In determining whether a "transaction or occurrence" is the same for purposes of Rule 13(a), the Seventh Circuit has developed a logical relationship test. *Burlington Northern R.R. Co. v. Strong*, 907 F.2d 707, 711 (7th Cir.1990).

> "Courts generally have agreed that the words 'transaction or occurrence' should be interpreted liberally in order to further the general policies of the federal rule and carry out the philosophy of Rule 13(a).... as a word of flexible meaning, 'transaction' may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their *logical relationship*.... [A] counterclaim that has its roots in a separate transaction or occurrence is permissive and is governed by Rule 13(b)."

*Id.* (citations omitted).

However, the court has admonished that "[d]espite this liberal construction ... our inquiry cannot be a " ' "wooden application of the common transaction label." ' " " *Id.* (citations omitted). Courts are to consider the totality of the claims, including the nature of the claims, the legal basis for recovery, the law involved, and the respective factual background. *Id.* at 711–12.

In the instant case, Genentech apparently uses its third-party beneficiary claim both offensively and defensively. Offensively, Genentech seeks to hold UC liable for its actions vis-a-vis the 1980 IPA between UC and the HEW and vis-a-vis the 1978 option agreement between Lilly and UC. Such claim would require this Court to consider the language of these agreements and the obligations the agreements placed on UC and Lilly. Defensively, Genentech asserts that the aforementioned agreements gave Genentech a right to a license to the '877 patent, and that this right should have precluded UC ever from lodging a patent infringement suit against it based on the '877 patent.

Since Genentech's defensive use of the third-party beneficiary claim will require an analysis of the same facts and law that offensive use of that claim would, we believe Genentech's third-party beneficiary claim properly is classified as compulsory. To hold otherwise would mandate review of the same facts and the same law by a different tribunal at a later date. Such a holding would counter Rule 13(a)'s purpose of furthering judicial economy.

■ Next, we address UC's contention that Genentech's Amended Complaint does not state a claim for breach of third-party obligations. First, UC argues that Genentech fails to plead the requisite reliance on the IPA in order to sustain a third-party

beneficiary claim against UC based on that document. We are not inclined to find that Genentech has failed adequately to plead reliance on the IPA. The 1978 option agreement was between UC and Lilly and included a clause mandating that Lilly sublicense biotechnology resulting from HEW-funded research to qualified applicants.

Genentech has pled in its Amended Complaint that it was aware that the HEW had funded research conducted by UC. Genentech also pled that it reasonably relied on 1978 option agreement. According to Genentech, those in the industry understood that governmental funding necessarily meant that the entity receiving funds would be required to enter an IPA with the HEW mandating that a good faith effort be made to license nonexclusively any technology that resulted from the governmental funding.

We believe that the sublicensing provision in the 1978 option agreement, when viewed in conjunction with the alleged common practice in the industry, liberally could be read to indicate that both UC and Lilly assumed UC would be required to enter an IPA with the HEW. Given this indication, it seem that Genentech equally could rely on industry custom. Thus, by stating that it relied on the 1978 option agreement, we believe Genentech, in effect, stated reliance on the forthcoming 1980 IPA.

UC also argues that because the IPA allowed UC to petition the HEW for a waiver of the IPA's obligations, and because Genentech asserts that it was aware of the IPA, Genentech cannot contend that it reasonably believed that the sublicensing obligations imposed by the IPA were beyond modification by the HEW. Along the same line, UC posits that the government retained its power to change the applicable laws and regulations because it had not evidenced an "unmistakable waiver" of such power. UC's Mem. in Supp. of Mot. to Dismiss at 19 (citing *Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598, 618–19 (D.C.Cir.1992).

Regardless, however, of the provision in the IPA permitting UC to petition for waiver and regardless of the lack of an "unmistakable waiver" on the part of the government, we believe there is a period of time during which a third-party beneficiary claim might find support. In 1980, UC and the HEW entered the IPA requiring a good faith effort to license nonexclusively, and in that same year UC's first request for waiver of the nonexclusive licensing provision was denied; in 1982, the '877 patent issued; in November of 1984, the law governing patents and licenses to inventions acquired with federal funding was amended; in April of 1987, UC again petitioned the HEW for waiver of the nonexclusive licensing provision; and in 1988, the HEW granted UC's second petition for waiver of the nonexclusive licensing provision.

From at least 1980, when the IPA was entered, to 1984, when the law governing exclusive licensing of inventions made via federal funding was amended, it appears that the IPA imposed obligations upon UC to license nonexclusively. According to Genentech, UC failed to meet this obligation. Recent discovery suggests and Genentech argues that between 1978 and 1984, UC had been contacted by no less than three firms interested in securing a license to the '877 patent, but that UC told these firm it already was obligated to Lilly on an exclusive basis.

Were it not for a statute of limitations problem, we might be inclined to find that Genentech had stated a third-party beneficiary claim based on the IPA. However, as we previously stated, the law regulating government-funded research was amended in 1984. Genentech did not file its third-party beneficiary claim until 1990—approximately six years after the amendment. Because the statute of limitations for an action on a written contract is four years, we believe Genentech missed the deadline for filing a claim based on the IPA as it existed under previous law. Furthermore, since we earlier determined that UC did not secure its waiver of nonexclusive licensing through fraud, we need not address Genentech's argument that such fraud played a part in UC's alleged breach of third-party obligations. Thus, the IPA does not provide a basis for Genentech's claim.

This leaves us to consider whether Genentech has stated a third-party beneficiary

claim based on its reliance on the 1978 option agreement between UC and Lilly. We believe that it has.

UC argues that although the 1978 option agreement obligated Lilly to grant sublicenses, yet the agreement imposed no obligations on UC. We disagree with this assessment. UC and Lilly both were parties to the 1978 option agreement, an agreement that Genentech alleges contained a provision for its benefit. We believe that UC's status as a party to the 1978 option agreement sufficiently indicates at this juncture that UC, as well as Lilly, was obligated to any third-party beneficiaries to that contract. Significantly, subsequent modification of the 1978 option agreement required UC's consent. Thus, Genentech's alleged classification as a third-party beneficiary relied on the actions of both parties to the contract.

We held in our May 2, 1994, Entry to Lilly's Motion to Dismiss that Genentech's Amended Complaint adequately alleges that Genentech reasonably relied on the 1978 option agreement. Am.Compl. ¶ 42. Furthermore, we stated an inference can be drawn that Genentech's continuing investment of its resources in hGH demonstrated a belief that it could obtain a sublicense. Thus, we believe Genentech has stated a third-party beneficiary claim against UC, and we deny UC's motion to dismiss this claim.[10]

### C. Count VI—Breach of 1980 Settlement Agreement

■ UC offers two arguments in its attempt to have Genentech's claim of breach of the 1980 settlement agreement between UC and Genentech dismissed for failure to state a claim. UC argues not only that such claim is a permissive counterclaim and, as such, is barred by the Eleventh Amendment, but also that the statute of limitations precludes the claim. We first consider whether the claim properly is classified as a compulsory or permissive counterclaim.

UC argues that resolution of Genentech's breach of the 1980 settlement agreement claim will involve facts and law totally unrelated to UC's claim of patent infringement. Genentech counters that the claim is so "inextricably intertwined" with that of UC's claim of patent infringement that it properly is considered a compulsory counterclaim.

Genentech asserts that the 1980 settlement agreement contains a provision authorizing Genentech to use the materials that are at the heart of UC's patent infringement action. This provision, Genentech argues, is one of its defenses to the infringement claim. Genentech contends that since the scope of the 1980 settlement agreement must be determined in order to resolve UC's patent infringement claim, the facts and issues surrounding the agreement logically are related to UC's infringement claim and, thus, arise out of the same transaction or occurrence.

The intertwinement Genentech describes as "inextricable," however, is one which does not appear in the Amended Complaint. Although Genentech initiated this action by seeking a declaratory judgment as to the invalidity, noninfringement and unenforceability of the '877 patent, yet there is not the slightest hint in the Amended Complaint that Genentech intended to assert noninfringement on the basis of prior authorization to use the materials in issue.

It is true that Genentech's proposed Second Amended Complaint includes a statement concerning UC's alleged release of the biological materials in the 1980 settlement agreement. However, as we stated earlier in this Entry, we believe that the delay in asserting conduct and facts of which the parties were aware at the time of the initiation of this litigation properly is labeled as "undue." Moreover, with so many years behind us and only a few months left before we conclude what has been a lengthy, problematic discovery process, we find that such undue delay in asserting long-known facts would be unduly prejudicial to the opponents. As a party to the 1980 settlement agreement, certainly Genentech cannot argue that it earlier was unaware of the release provision in the agreement. We cannot fathom why Genen-

---

10. As we held in our May 2, 1994, Entry, a determination of whether Genentech was indeed an intended third-party beneficiary under the 1978 option agreement is reserved for a later date.

tech would have waited so long to assert the release provision if, indeed, Genentech has a good faith belief that the provision truly provides a defense. However, because we find that Genentech's assertion comes too late in this litigation, we need not determine whether such eleventh-hour tactic was mounted in good faith.

In summary, we deny Genentech's motion to amend the Amended Complaint to include an assertion that the 1980 settlement agreement authorized it to use certain biological materials. This assertion provided Genentech with its only "logical relationship" argument in support of classifying its claim of UC's breach of the 1980 settlement agreement as compulsory. Thus, we grant UC's motion to dismiss this claim on the ground that it is permissive and, as such, is barred by the Eleventh Amendment.[11]

### D. Count VII—Unfair Competition

In UC's motion to dismiss, UC contends that Genentech has failed to state an unfair competition claim against it in the Amended Complaint and offers arguments in support of that contention. In Genentech's opposition to UC's motion, rather than arguing that it had stated such a claim, Genentech merely notes that its proposed Second Amended Complaint does not assert an unfair competition claim against UC. Genentech's Opp'n at 2. From this response, we assume that Genentech no longer asserts that UC competed unfairly. Hence, we dismiss Genentech's unfair competition claim against UC.

### E. Count VIII—Tortious Interference with Contract and with Prospective Business Advantage

In its motion to dismiss, UC asserts that Genentech's claim against UC of tortious interference with contract and with prospective business advantage cannot be maintained. UC argues that not only is the claim barred by the statute of limitations, but also because the California Supreme Court has deter-

mined that a party may not be held liable either for tortious interference with its own contract or for conspiring with a third party to interfere in that contract. UC's Mem. in Supp. of Mot. to Dismiss at 23 (citing *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal.4th 503, 28 Cal.Rptr.2d 475, 869 P.2d 454 (1994)).

In Genentech's opposition to UC's motion, Genentech does not mention its claim of tortious interference. Moreover, in Genentech's Proposed Second Amended Complaint, there is no mention of such a claim. Thus, as with the fraud and unfair competition claims, we assume that Genentech's failure to respond indicates that abandonment of this challenge. Therefore, UC's motion to dismiss the tortious interference claim is granted.

### III. Conclusion

The Court concludes as follows: [1] Genentech's § 1 Sherman Act claim against Lilly is reinstated; [2] Genentech's motion to amend to state § 1 and § 2 Sherman Act claims against UC is denied; [3] Genentech's motion for leave to amend to reallege the UC–Lilly licensing arrangement as support for its antitrust claims is denied; [4] Genentech's motion to amend to include a claim of fraud on the HEW in support of its antitrust claims against Lilly is denied; [5] Genentech's motion to amend to include the Irons opinion in support of its *Handgards* antitrust theory and unfair competition claims against Lilly is granted; [6] Genentech's request for this Court to reconsider its previous ruling prohibiting Genentech from using Lilly's alleged misuse of insulin technology in support of its unfair competition claims is denied, and Genentech likewise is prohibited from using the misuse evidence in support of its antitrust claims; [7] Genentech's motion to amend to include disparagement allegations against Lilly is denied; [8] Genentech's motion to amend to add a trade libel claim is denied; and [9] Genentech's motion to amend to in-

11. Our determination that this claim is permissive rather than compulsory makes it unnecessary for us to consider UC's statute of limitations argument or the propriety of permitting amendment pursuant to Genentech's supplement to paragraph 38 of its proposed Second Amended

Complaint. Such supplement apparently was designed to ensure that Genentech properly had illustrated in its proposed Second Amended Complaint that the statute of limitations was not a bar to Genentech's claim of breach of the 1980 settlement agreement.

clude a common law unfair competition claim is granted.[12]

Furthermore, [1] UC's motion to dismiss counts II and III, the antitrust claims, insofar as they are lodged against UC is granted; [2] UC's motion to dismiss count IV regarding fraud is granted; [3] UC's motion to dismiss count V, concerning third-party beneficiary obligations, is granted in part and denied in part; [4] Genentech's motion to restate and clarify count VI, which contains Genentech's claim of breach of the 1980 settlement agreement, is denied, and UC's motion to dismiss count VI is granted; [5] UC's motion to dismiss count VII, Genentech's statutory unfair competition claim, insofar as it is lodged against UC, is granted; and [6] UC's motion to dismiss count VIII, Genentech's tortious interference claim, is granted.

See also 874 F.Supp. 927.

---

12. Genentech has moved the Court for permission to file one reply memorandum in response to both UC's and Lilly's opposition to the instant motion, which reply memorandum is in excess of the page limitation established in Local Rule 7.1. The Court grants Genentech's motion. However, Lilly's motion for leave to file a surreply memorandum in opposition to· Genentech's motion for leave further to amend its Amended Complaint is denied. No further briefing was necessary for purposes of this Entry.