143 F.3d 1446
 126 Ed. Law Rep. 621, 46 U.S.P.Q.2d 1586
 GENENTECH, INC., Plaintiff-Appellant,
v.
REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant-Appellee,
and
Eli Lilly and Company, Defendant,
and
United States, Intervenor.
GENENTECH, INC., Plaintiff-Appellee,
v.
REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant-Appellant,
and
Eli Lilly and Company, Defendant.
 Nos. 96-1361, 97-1099.
 United States Court of Appeals,
Federal Circuit.
 May 4, 1998
Rehearing Denied; Suggestion for Rehearing In Banc
Declined Aug. 5, 1998.
 
 John E. Kidd, Rogers & Wells, New York City, argued for Genentech, Inc. With him on briefs were Leora Ben-Ami and Joseph Ferraro.
 Gerald P. Dodson, Arnold, White & Durkee, Menlo Park, CA, argued for Regents of University of California. With him on brief were Emily A. Evans, Menlo Park, CA, and Richard L. Stanley, Houston, TX. Of counsel on brief was P. Martin Simpson, Jr., University of California, Office of Technology Transfer, Alameda, CA.
 Michael S. Raab, Attorney, Civil Division, Appellate Staff, Department of Justice, Washington, DC, argued for United States. With him on brief were Frank W. Hunger, Assistant Attorney General, and Mark B. Stern, Attorney.
 Before: NEWMAN, LOURIE, and RADER, Circuit Judges.
 PAULINE NEWMAN, Circuit Judge.
 
 
 1
 Genentech, Inc. appeals from the dismissal, on Eleventh Amendment grounds, of its declaratory action in the United States District Court for the Southern District of Indiana against the Regents of the University of California ("the University") and Eli Lilly and Company ("Lilly").[1] The litigation relates to United States Patent No. 4,363,877 ("the '877 patent") owned by the University and exclusively licensed to Lilly. In Genentech, Inc. v. Eli Lilly & Co., 998 F.2d 931, 27 USPQ2d 1241 (Fed.Cir.1993) (Genentech I ) this court held that the Eleventh Amendment of the Constitution[2] did not insulate the University from this suit, in view of the enactment in 1992 of Public Law 102-560, codified at 35 U.S.C. §§ 271(h) and 296, which abrogated the states' Eleventh Amendment immunity from suit for any violation under Title 35.
 
 
 2
 The constitutionality of Public Law 102-560 was not challenged in Genentech I, for its enactment was consonant with the holding of Pennsylvania v. Union Gas Co., 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), that Article I of the Constitution empowers abrogation of state immunity when appropriate to the federal purposes of Article I. Thus the only issue requiring constitution-based interpretation in Genentech I was whether the abrogation in Public Law 102-560 included declaratory actions against the state for claims under Title 35 other than patent infringement by the state. Concluding that it did, the Federal Circuit observed that the statute was explicitly directed not only to infringement but also to "any other violation under this title." Implementing this scope, the court stated: "There is no exception in Public Law 102-560 that preserves state immunity depending on the procedure by which issues are raised. Indeed, such an exception would contravene the legislative purpose of conferring equal status on states and nongovernmental entities under the patent law." Genentech I, 998 F.2d at 943, 27 USPQ2d at 1249.
 
 
 3
 The litigation proceeded by way of multidistrict consolidation of six cases involving the '877 and several other patents, involving Genentech, Lilly, and the University. See In re Regents of the Univ. of Cal., 964 F.2d 1128, 22 USPQ2d 1748 (Fed.Cir.1992) (holding that the Eleventh Amendment did not shield a state from multidistrict procedures under the Federal Rules when the state was otherwise properly before the federal courts). Four of these cases have been decided or settled, as have all issues between Genentech and Lilly. Remaining are this Indiana district court action and its later-filed "mirror-image" in the Northern District of California, where the University is plaintiff and Genentech is defendant but the issues are otherwise generally the same.
 
 
 4
 Upon completion of the multidistrict proceedings this Indiana action was resumed. Genentech seeks, inter alia, declaration of patent invalidity, unenforceability, and non-infringement of the '877 patent, and the University has counterclaimed for patent infringement and other relief. Both sides have pled violations of laws in addition to the patent law, including federal and state antitrust and other laws. The existence of a case of actual controversy, 28 U.S.C. § 2201 (Declaratory Judgment Act), is not disputed.
 
 
 5
 While this case was before the Indiana district court the Supreme Court decided Seminole Tribe of Florida v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), holding that Article I of the Constitution did not empower Congress to abrogate a state's Eleventh Amendment immunity and expressly overruling the Court's contrary decision in Pennsylvania v. Union Gas. The district court then held that Public Law 102-560 must now be deemed to be in violation of the Eleventh Amendment, at least as applied in Genentech I to encompass a declaratory action against the state when the state is the patent owner.[3]
 
 
 6
 For the reasons we shall discuss, we conclude that in light of Seminole Tribe this court's ruling in Genentech I can not stand on the ground on which it was premised, whereby the unchallenged constitutionality of Public Law 102-560, as based on Article I and Pennsylvania v. Union Gas, was interpreted as embracing all actions under Title 35 including declaratory actions. The district court, observing that Article I is no longer an available constitutional empowerment for legislative abrogation of Eleventh Amendment immunity, expressed the view that the constitutionality of Public Law 102-560 was sustainable under section 5 of the Fourteenth Amendment if the statute were limited to situations wherein the state is charged with patent infringement. We conclude that it is not necessary here to decide whether Public Law 102-560 may be interpreted or applied so as to sustain its constitutional validity, for on the facts of this case we conclude that the University waived its Eleventh Amendment immunity and consented to this suit.
 
 
 7
 * APPEAL NO. 97-1099
 
 
 8
 * Legislative abrogation of the Eleventh Amendment immunity of states requires that two criteria be met. First, there must be an unequivocal expression of congressional intent to abrogate the immunity, in the form of a "clear legislative statement." Seminole Tribe, 517 U.S. at 55, 116 S.Ct. at 1123; Blatchford v. Native Village of Noatak, 501 U.S. 775, 786, 111 S.Ct. 2578, 2584-85, 115 L.Ed.2d 686 (1991); Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 246, 105 S.Ct. 3142, 3149, 87 L.Ed.2d 171 (1985). Public Law 102-560 was enacted in 1992 for the purpose of abrogating Eleventh Amendment immunity in patent cases, to close a "sovereign immunity loophole" of which states were said to be taking unfair advantage. 137 Cong. Rec. 53930-02 (daily ed. Mar. 21, 1991) (statement of Sen. DeConcini). The legislative statement is indeed unequivocally expressed, and is codified in Title 35 as follows:
 
 35 U.S.C. § 271 Infringement of patent
 
 9
 * * *
 
 
 10
 * * *
 
 
 11
 (h) As used in this section, the term "whoever" includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this title in the same manner and to the same extent as any nongovernmental entity.
 
 
 12
 35 U.S.C. § 296 Liability of States, instrumentalities of States, and State officials for infringement of patents
 
 
 13
 (a) In General.--Any State, any instrumentality of a State, and any officer or employee of a State acting in his official capacity, shall not be immune, under the eleventh amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court by any person ... for infringement of a patent under section 271, or for any other violation under this title.
 
 
 14
 (b) Remedies.--In a suit described in subsection (a) for a violation described in that subsection, remedies (including remedies both at law and in equity) are available for the violation to the same extent that such remedies are available for such a violation in a suit against any private entity. Such remedies include damages, interest, costs, and treble damages....
 
 
 15
 In Genentech I the court applied § 296(a), that the state "shall not be immune ... for any other violation under this title," to include actions for declaration of patent invalidity and noninfringement, in order to achieve the remedial purpose of § 296(b) that the state shall be subject to the same remedies as "any private entity." 998 F.2d at 941-43, 27 USPQ2d at 1247-48.
 
 
 16
 The second criterion of legislative abrogation is that Congress must have acted "pursuant to a valid exercise of power." Seminole Tribe, 517 U.S. at 57-58, 116 S.Ct. at 1124 (quoting Green v. Mansour, 474 U.S. 64, 68, 106 S.Ct. 423, 425-26, 88 L.Ed.2d 371 (1985)). Congress ascribed its empowerment for this enactment to the Commerce Clause of Article I, the Patent/Copyright Clause of Article I, and section 5 of the Fourteenth Amendment. See S.Rep. No. 102-280, at 7-8 (1992), reprinted in 1992 USCCAN 3087, 3093-94. Although the constitutionality of congressional enactments does not depend on recital of the source of the power that is being exercised, Woods v. Cloyd W. Miller Co., 333 U.S. 138, 144, 68 S.Ct. 421, 424, 92 L.Ed. 596 (1948), we take note that Congress did state its authority, as well as its intent to overrule certain decisions of the Federal Circuit which held that the states were immune, under the Eleventh Amendment, from suit for patent infringement.
 
 
 17
 The Court, emphasizing the fundamental principles of the federal-state relationship that underlie the Eleventh Amendment, held in Seminole Tribe that Article I legislative authority did not empower Congress to abrogate state immunity, and overruled Pennsylvania v. Union Gas. In Union Gas the Court had sustained the constitutionality of legislation that required the states to conduct environmental cleanup under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980; the Court drew on the Interstate Commerce Clause of Article I to empower Congress to enact, and federal courts to enforce, this legislation. Similarly, in enacting the legislation at issue in Seminole Tribe Congress relied on the authority of the Indian Commerce Clause of Article I to support a provision of the Indian Gaming Regulatory Act which subjected the state to suit in federal court if the state did not negotiate in good faith with the Indian tribe in implementation of the Act. The Court observed that insofar as legislative and judicial power with respect to states is concerned, there is no principled distinction between the Interstate Commerce Clause, on which Union Gas was grounded, and the Indian Commerce Clause. Pointing up the breadth of its decision, the Court explained:
 
 
 18
 Even when the Constitution vests in Congress complete law-making authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting states. The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction.
 
 
 19
 Seminole Tribe, 517 U.S. at 72-73, 116 S.Ct. at 1131-32. The Court did not ignore that its ruling could have an impact on the copyright and patent laws, although this impact was not explored. Justice Stevens mentioned it in dissent, id. at 77, 116 S.Ct. at 1134, and the Court's opinion suggested possible recourse to the procedure of Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Id. at 72-73 n. 16, 116 S.Ct. at 1131-32 n. 16. Although we doubt that these remarks were intended to resolve all aspects of the complex issues of intellectual property rights involving the states, the Court's reference to "complete [federal] law-making authority" is readily read as embracing the patent law.
 
 
 20
 The Court recognized that Article I is not the sole source of federal power with respect to states, and observed that the statute at issue in Seminole Tribe did not implicate section 5 of the Fourteenth Amendment. Further, the Court did not discuss whether there may be actions taken by a state agency that are not state actions for Eleventh Amendment purposes, or mention the vast variety of a state's interactions with private interests that have been litigated on particular facts, with varying results. The Court did observe that a state can always waive its immunity and consent to suit. However, the ruling in Seminole Tribe appears to have removed Article I alone as the source of congressional power to abrogate Eleventh Amendment immunity.
 
 
 21
 The district court held that the statutory abrogation in Public Law 102-560, in the breadth necessary to support this declaratory action against the University, requires the support of Article I, and is not supported by the Fourteenth Amendment. Genentech argues that Public Law 102-560 is constitutional as it was written and as interpreted in Genentech I, reasoning that this statutory abrogation does not depend solely on the Commerce Clause of Article I, as did Union Gas, but derives authority from the particular nature and policy of the Patent Clause of Article I, and broad property principles in accordance with the Fourteenth Amendment. Genentech argues that if it is deprived of the right to bring this declaratory action against the University, it is deprived of property and liberty interests without due process of law, behavior expressly prohibited by the Fourteenth and Fifth Amendments. Genentech also raises questions of equal protection of the law if the University can sue Genentech when and where it pleases, while Genentech is barred from seeking remedy in the courts on the same issues.
 
 
 22
 Genentech argues that the overruling of Union Gas does not preclude all legislative reliance on Article I to provide constitutional authority for Public Law 102-560. Distinguishing this legislation from that in Union Gas, Genentech points out that Public Law 102-560 does not compel the state to act under federal supervision or compulsion, unlike the legislation in Union Gas which authorized the federal courts to compel the state to clean up its waste. Distinction may also be drawn from the facts of Seminole Tribe, where the challenged legislation required the state governor to negotiate with the Tribe. In contrast, Genentech points out that the University has acted voluntarily, not by compulsion of statute; that the University has chosen to obtain the benefits of the federal patent system, and thereby has acquired property rights that are not confined to the territory of a particular state. The University has acted to enforce these property rights throughout the nation, through the authority of the federal judicial system. Thus Genentech argues that the Patent Clause of Article I empowers the enactment of Public Law 102-560 and supports its constitutionality as interpreted in Genentech I.
 
 
 23
 Indeed, the character of the Patent/Copyright Clause of Article I, embodying the national policy of fostering a creative and innovative society, imposes cautious restraint when interpreting this clause. Although the district court read Seminole Tribe as foreclosing any congressional empowerment based on any part of Article I, we do not deem it necessary to speak so broadly, or to foreclose any contribution of these policy principles to further review of the applicability of the Fourteenth Amendment. It is, however, clear that our reliance in Genentech I on the authority of Pennsylvania v. Union Gas, whereby we interpreted Public Law 102-560 to abrogate immunity for this declaratory action against the University, can not now be sustained on this ground. The district court held that the Fourteenth Amendment did not fill this gap insofar as this declaratory action was concerned. Section 1 of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law," and section 5, implementing this provision, grants Congress the power "to enforce, by appropriate legislation, the provisions of this article." The Court in Seminole Tribe recognized that the Fourteenth Amendment "had fundamentally altered the balance of state and federal power struck by the Constitution," 517 U.S. at 59, 116 S.Ct. at 1125, superseding, but only to the extent set forth therein, the states' immunity under the Eleventh Amendment. See, e.g., Fitzpatrick v. Bitzer, 427 U.S. 445, 455, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976) (section 5 of the Fourteenth Amendment empowers congressional abrogation of states' immunity); see also City of Boerne v. Flores, --- U.S. ----, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).
 
 
 24
 The district court expressed the view that Public Law 102-560 would be supported by the Fourteenth Amendment if the statute were interpreted as limited to actions against the state to remedy patent infringement by the state. Genentech disputes the need for this limitation, and argues that the constitutionality of Public Law 102-560 as written and as construed in Genentech I is supported by the Fourteenth Amendment since the University's patent-based threats and actions have directly affected Genentech's constitutionally-recognized property rights, and that deprivation of a remedy is a violation of due process of law. Genentech states that the University's threats of infringement and injunction have inhibited its commercial activity and exposed it to accruing damages, with the added risk of punitive damages for willful infringement if its defenses should fail. Genentech states that it has invested heavily in manufacturing plant and distribution, and that the '877 patent may be invalid or unenforceable yet is being wielded by the University/patentee as a commercial tool at the behest of a commercial competitor. Genentech states that it has a legally cognizable property right in its commercial investments and activities and prospects.
 
 
 25
 Genentech states that when the Constitution is implicated it is improper to draw lines among degrees of property interests or procedures for litigating disputes. Genentech states that Seminole Tribe does not require the anomalous interpretation whereby Public Law 102-560 would be deemed constitutional if applied to a state's deprivation of property by infringement of a privately owned patent, but unconstitutional if applied to a state's deprivation of property by threats to sue for infringement of a state-owned patent. The University responds that there is insufficient authority to sustain Genentech's theory of property deprivation based on threats of legal action and injunction, that Genentech has no property or liberty interest in infringing the University's patents, and that since no commercial activity has yet been shut down there has been no deprivation of property. Citing City of Boerne v. Flores, the University states that the Fourteenth Amendment does not provide the requisite congressional power for Public Law 102-560 as interpreted in Genentech I.
 
 
 26
 Genentech, stressing the inequity of permitting the University to manipulate judicial resolution of this controversy while materially interfering with commercial interests to the benefit of competitive commercial interests, suggests that the Court in Seminole Tribe can not have intended to eliminate declaratory remedy for a state's deprivation of commercial property that, because federal courts have exclusive jurisdiction of patent cases, can not be remedied in the state courts. Contrast Idaho v. Coeur d'Alene Tribe of Idaho, --- U.S. ----, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997), wherein the Court pointed out that although the state has Eleventh Amendment immunity from suit in federal court, the Coeur d'Alene Tribe can obtain full relief in the state courts concerning title to territory located within the state. The University responds that the Court in Seminole Tribe did not intend that occasional inequity, should it arise, would override the constitutional primacy of the principles of the Eleventh Amendment.
 
 
 27
 The district court, hearing the arguments, held that Genentech "has no protectable property right of which it has been deprived without due process of law." Resolving this question is unnecessary to our decision. Thus we do not decide whether the Fourteenth Amendment and the Patent Clause of Article I can support Public Law 102-560 as it was applied in Genentech I. See Califano v. Yamasaki, 442 U.S. 682, 692-93, 99 S.Ct. 2545, 2553-54, 61 L.Ed.2d 176 (1979) (courts should avoid unnecessary constitutional adjudication). Nor do we decide whether Public Law 102-560 can be interpreted or applied to provide a constitutionally secure remedy for infringement by the state, as postulated by the district court. This question is before this court in College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, 948 F.Supp. 400 (D.N.J.1996) (appeal to Federal Circuit pending).[4] We need not now decide the constitutional question, for we conclude that the University has by its litigation-related actions waived its immunity and consented to this suit.
 
 B
 
 28
 The Eleventh Amendment is not directed to the competence of the federal courts, but "enacts a sovereign immunity from suit, rather than a nonwaivable limit on the federal judiciary's subject matter jurisdiction." Coeur d'Alene Tribe, --- U.S. at ----, 117 S.Ct. at 2033. As stated in Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984), "the Court consistently has held that a State may consent to suit against it in federal court." We take note that the state of California has broadly granted complainants access to state courts, and that the University is the subject of a specific sue-and-be-sued provision. Cal. Const. art. IX, § 9(f). It is the principles of federalism that shield a state from federal judicial authority. Although waiver of that shield and the imposition of consent to federal authority upon a state agency is rare, in the circumstances that here exist we conclude that the University has waived its immunity from suit in federal court and has constructively consented to the declaratory judgment action brought by Genentech.
 
 
 29
 In reaching this conclusion we place weight on the University's voluntary and deliberate creation of a case or controversy that can be resolved only in federal courts, concerning federally-created property rights of national scope that are enforceable only by federal judicial power. Waiver or consent requires more than a strong federal interest in the subject matter of the controversy. We do not hold that simply by the act of obtaining federal patents the University waived Eleventh Amendment immunity. Analogy is drawn to Atascadero State Hospital v. Scanlon, 473 U.S. at 246-47, 105 S.Ct. at 3149-50, where the Court held that by accepting funds under the Federal Rehabilitation Act the hospital did not consent to suit in federal court. The state must not only have entered a field of activity that is subject to federal law, but must have actively invoked federal judicial power to aid that activity. It is thus highly relevant that the University acted to create the federal cause of action by its charge of patent infringement and threat of federally imposed and enforced remedial action.
 
 
 30
 Although the University has the right to refrain from taking actions that implicate federal jurisdiction, and Congress can not legislate otherwise, see Seminole Tribe, when the University chooses to enter the federal arena, when the University's action in creating the controversy is within its sole control and initiative, and when the University invokes the systems of federal law and federal judicial power for enforcement of federal property rights, actionable only in federal court, including property rights extraterritorial to the state, the state is deemed to have waived its immunity from federal authority to resolve that controversy. The University has voluntarily entered the federal milieu and has consented to the federal jurisdiction whose force it invokes. Although the University argues that it did not consent to the federal declaratory judgment action brought by Genentech, the declaratory action was enabled solely by the University's deliberate acts.
 
 
 31
 It is also a factor to be considered that the University's actions are not at the core of the educational/research purposes for which the University was chartered as an arm of the state,[5] although the record contains no basis for disputing that a research university's patenting activity serves to move into public benefit scientific inventions that might otherwise languish as laboratory curiosities. The question "whether there may be some state instrumentalities that qualify as 'arms of the state' for some purposes but not others," was raised but not answered in Regents of the University of California v. Doe, 519 U.S. 425, ---- & n. 2, 117 S.Ct. 900, 902 & n. 2, 137 L.Ed.2d 55 (1997). We too do not answer that question, for our decision does not require analysis of the magnitude of the commercial component in the relationship between the University's research activities and its dissemination of that research through patents and industrial licenses.[6] However, it is not irrelevant, in connection with the University's claimed immunity, that this commercially-oriented activity is not central to the University's charter.
 
 
 32
 The University states that it is simply managing its property for optimum income, citing provisions of California law requiring it, in the University's words, to "manage its real and personal property for the public benefit." See Cal. Educ.Code § 92431. However, patent property is neither real nor ordinary personal property, as is normally subject to the jurisdiction of state judicial authority. Patent property is of national scope--the federal government grants to the patentee the right to exclude others from making, using, or selling the patented subject matter anywhere in the United States and its possessions. Neither the creation nor the validity or enforcement of this right is subject to state law. The University's threats against Genentech are directed to national rights that are independent of and ungovernable by state law. Unlike the recourse to state courts proposed by the Court in Coeur d'Alene, there is no remedy in state courts affecting the validity or infringement of patent property. Thus although University ownership of federal patents is not of itself a waiver of federal immunity, neither are the University's actions in enforcing its patents immunized against waiver by the California Education Code.
 
 Conclusion
 
 33
 We conclude that the University has consented to this suit, on the combination of factors present in this case, i.e., the creation of federal property rights by federal law, property of national effect that is actionable only through the federal judicial power, accompanied by the University's threats of suit in federal court, invoking the remedial power of nation-wide injunction, whereby the University voluntarily created a case and controversy under Article III that can be resolved only by federal judicial authority. By these actions, deliberately undertaken and within the University's control, the University has manifested its consent to the Article III judicial power and this declaratory action, and has waived any immunity as an arm of the state.[7]
 
 
 34
 With our holding that the University waived its Eleventh Amendment immunity and consented to this suit, it follows that this declaratory action was improperly dismissed by the Indiana district court. We reverse that dismissal, and remand for appropriate further proceedings.
 
 II
 OTHER ISSUES
 
 35
 * As mentioned supra, in Seminole Tribe the Court implied that the Ex parte Young procedure was available to provide remedy under the patent and copyright laws. 517 U.S. at 72-73 n. 16, 116 S.Ct. at 1131-32 n. 16. Courts have employed the Ex parte Young doctrine in ordering state officials to comply, for example, with the Clean Water Act, see Natural Resources Defense Council v. California Dep't of Transp., 96 F.3d 420 (9th Cir.1996); Mancuso v. New York State Thruway Auth., 86 F.3d 289 (2d Cir.1996). See generally Coeur d'Alene Tribe, --- U.S. ----, 117 S.Ct. 2028 (discussing limitations of the Young doctrine).
 
 
 36
 Ex parte Young presents novel questions of applicability to an action requesting declaration of patent invalidity and noninfringement. We do not explore these aspects, for in this case the district court had refused to permit an amended complaint against the Regents in their individual capacities, and this court deemed the appeal of that question mooted by the enactment of Public Law 102-560. Genentech I, 998 F.2d at 940, 27 USPQ2d at 1247. Although Genentech again raises the issue, in view of our decision we do not further consider this procedure.
 
 B
 
 37
 Genentech conditionally appealed certain interlocutory rulings of the district court, inquired as to the finality of other rulings, and expressed concern about preserving its right to appeal certain rulings upon final judgment, citing jurisdictional uncertainties flowing from the actions taken in the multidistrict proceeding and the movement between the Indiana and the California district courts. Genentech particularly directs attention to the district court's grant of summary judgment that Genentech is not a third-party beneficiary of the University/Lilly license, Genentech, Inc. v. Regents of the Univ. of Cal., 952 F.Supp. 617, 622 (S.D.Ind.1996); the district court's refusal to permit Genentech to amend its complaint to add a Sherman Act claim, on the ground that the University is entitled to Parker immunity [Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) ], In re Recombinant DNA Tech. Patent & Contract Litig., 874 F.Supp. 904 (S.D.Ind.1994); and other rulings made in either the multidistrict proceeding or the Indiana action.
 
 
 38
 We hold that all of these rulings, to the extent that they are appealable, are preserved for appeal upon final judgment. Neither side shall be deemed to have forfeited any right of appeal by virtue of the procedural and jurisdictional complexities of this case.
 
 III
 APPEAL NO. 96-1361
 
 39
 This separate appeal, relating to two interlocutory issues arising from this litigation, was considered in conjunction with Appeal No. 97-1099.
 
 
 40
 * During the multidistrict proceedings under 28 U.S.C. § 1407, In re Recombinant DNA Tech. Patent & Contract Litig., No. 912 (JPML filed Feb. 19, 1992), the United States District Court for the District of Indiana denied the University's motion to dismiss Genentech's third-party beneficiary claim. In re DNA Tech., 874 F.Supp. 904 (S.D.Ind.1994). Upon completion of the multidistrict proceedings, the same district court granted summary judgment in favor of the University on Genentech's third-party beneficiary claim. Genentech, Inc. v. Regents of the Univ. of Cal., 952 F.Supp. 617, 622 (S.D.Ind.1996). That judgment was appealed in Appeal No. 97-1099. Thus the appeal of this issue in Appeal No. 96-1361 is dismissed.
 
 B
 
 41
 The University also appealed from the district court's grant of an injunction prohibiting it from filing actions bringing certain antitrust and other claims in other courts. Genentech v. Regents, No. IP-90-1679-C-D/G, order at 7-8 (S.D.Ind. Apr. 12, 1996). In accordance with 28 U.S.C. § 1292(c)(1) an interlocutory order granting an injunction is appealable.
 
 
 42
 During pendency of the multidistrict proceedings before the district court in Indiana, the University moved for authorization to file a complaint in California district court. The proposed complaint contained a count for infringement of the same patent in suit, and also counts alleging violations by Genentech of sections 1 and 2 of the Sherman Act based on its marketing practices in selling the accused infringing product. Substantially the same allegations were made in the University's proposed state court antitrust complaint, for which filing authorization was also sought. The district court, denying the motion, held that the University's "proposed state and federal claims are compulsory counterclaims and must be lodged, if at all, in the context of the instant litigation." Order, April 12, 1996, at 7. Determination that a claim is a compulsory counterclaim is reviewed for abuse of discretion. Warshawsky & Co. v. Arcata Nat'l Corp., 552 F.2d 1257, 1265 (7th Cir.1977).
 
 
 43
 Fed.R.Civ.P. 13(a) defines "compulsory counterclaim" as "any claim which ... arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." In Burlington N. R.R. Co. v. Strong, 907 F.2d 707 (7th Cir.1990) the court applied the three-part test for determining whether counterclaims are compulsory: "In order to be a compulsory counterclaim, Rule 13(a) requires that the claim (1) exist at the time of pleading, (2) arise out of the same transaction or occurrence as the opposing party's claim, and (3) not require for adjudication parties over whom the court may not acquire jurisdiction." Id. at 710-11. The scope of "transaction or occurrence" is liberally interpreted, as the court determines whether there is a logical relationship between the claim in suit and the counterclaim. See Price v. United States, 42 F.3d 1068, 1072-73 (7th Cir.1994); Burlington, 907 F.2d at 711.
 
 
 44
 In the case at bar, the district court observed that the claims and counterclaims all flow from the charge of patent infringement. Although antitrust violations involve a different body of law and different remedies, the underlying event is the validity and infringement of the patent. Indeed, the proposed new complaint for filing in California district court included the same charge of infringement that had not yet been litigated, and would be part of the Indiana suit.
 
 
 45
 The dominant criterion for deciding whether a counterclaim is compulsory is not whether additional evidence would be required to prove the counterclaim; it is whether, in the interest of judicial economy, the causes arose out of the same transaction or occurrence and should reasonably be litigated in the same suit. In making this determination, which invokes judicial discretion, the court may give weight to the advantages of consolidation, efficiency, and expedition, in requiring that issues arising from related facts be litigated in the same suit. See generally 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1409, at 46-47 (2d ed.1990). We take note that there is not unanimity among the circuits on this question as applied to antitrust counterclaims in patent infringement suits, that the Court's statement on this issue in Mercoid Corp. v. Mid-Continent Inv. Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376 (1944) has occasioned varied application on particular facts, and that the district court's ruling does not contravene Seventh Circuit precedent.
 
 
 46
 We observe that antitrust issues already are included in the Indiana case. There has yet to be a trial on the merits. With consideration to the totality of the claims of both sides, the factual backgrounds of each, and the law, we conclude that the district court did not exceed its discretionary authority in viewing the University's proposed separate federal and state actions as compulsory counterclaims. See Price, 42 F.3d at 1073 ("The purpose behind the rule is judicial economy").
 
 
 47
 The district court's injunction prohibiting the University from filing separate infringement and antitrust complaints in other forums is affirmed.
 
 
 48
 APPEAL NO. 97-1099/REVERSED AND REMANDED. APPEAL NO. 96-1361/AFFIRMED.
 
 
 
 [1]
 Genentech, Inc. v. Regents of the Univ. of Cal., 939 F.Supp. 639, 40 USPQ2d 1768 (S.D.Ind.1996)
 
 
 [2]
 The Eleventh Amendment provides:
 XI. The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 
 
 [3]
 California law establishes the University as a branch of the State of California "equal and coordinate with the legislature, the judiciary, and the executive", a public corporation, and a public trust. 30 Cal. Ops. Att'y Gen. 162 (1957). The status of the University as an arm of the state is not challenged
 
 
 [4]
 Issues arising from similar copyright legislation are treated in Chavez v. Arte Publico Press, 139 F.3d 504 (5th Cir.1998)
 
 
 [5]
 The University is California's "primary state-supported academic agency for research," and is charged with the mission to "provide undergraduate instruction in the liberal arts and sciences and in the professions." Cal. Educ.Code § 66010.4(c)
 
 
 [6]
 We are directed to a press report that in 1994 the University received $50.2 million in royalties, filed 389 patent applications, and received 126 patents
 
 
 [7]
 In view of the challenge to the constitutionality of a federal statute, the United States has intervened in accordance with 28 U.S.C. § 2403(a). The position of the United States is that the University consented to be sued, waiving any immunity when it acted to obtain, to license, and to enforce the '877 patent